**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES,**
Plaintiff, Appellee,

v.

**GUILFORD TRANSPORTATION INDUSTRIES, INC., et al.,**
Defendants, Appellees.

**Appeal of DELAWARE AND HUDSON RAILWAY COMPANY,**
Defendant, Appellant.

**No. 86–1366.**

United States Court of Appeals,
First Circuit.

Argued Sept. 5, 1986.

Decided Oct. 28, 1986.

Richard T. Conway, with whom Shea & Gardner, Ralph J. Moore, Jr., William F. Sheehan, Nancy J. Bregstein, D. Eugenia Langan, and Kinga M. LaChapelle, Washington, D.C., were on brief for appellant.

John O'B. Clarke, Jr., with whom Highsaw & Mahoney, P.C., Washington, D.C., Craig J. Rancourt, Law Office of Craig J. Rancourt, Biddeford, Me., and Louis P. Malone, III, Gen. Counsel, Washington, D.C., were on brief for appellee Broth. of Maintenance of Way Employees.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

The principal issue presented by this appeal is whether the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA), overrides the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, to the extent of permitting the enjoining of secondary picketing by a labor organization that has exhausted the procedures established by the RLA for resolution of a "major" dispute[1] with a primary carrier-employer.[2] Although this is a question of first impression in this circuit, we are the fortunate beneficiaries of prior consideration of this query by several of the courts of appeal. *See Burlington Northern R. Co. v. B.M.W.E.,*

---

1. In RLA parlance a "major" dispute arises from the formation or negotiation of changes to agreements regarding rates of pay, rules, or working conditions. *See Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945); 45 U.S.C. §§ 155–160. A "minor" dispute is concerned with the resolution of grievances and other disputes concerning the interpretation or application of existing collective bargaining agreements. *Brotherhood of Railroad Trainmen v. Chicago River & Ind. R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), 45 U.S.C. § 153.

2. We are not deciding whether secondary activity is enjoinable prior to exhaustion of RLA dispute resolution procedures with the primary carrier employer.

793 F.2d 795 (7th Cir.1986) (cannot enjoin secondary boycott); *Central Vermont Ry. v. Broth. of Maintenance*, 793 F.2d 1298 (D.C.Cir.1986) (cannot enjoin secondary picketing); *Richmond, Fredericksburg and Potomac R.R. Co. v. B.M.W.E.*, 795 F.2d 1161 (4th Cir., 1986) (same). *But see, Ashley, Drew and Northern Ry. v. UTU*, 625 F.2d 1357 (8th Cir.1980) (secondary picketing may be enjoined when the interests of the party being picketed are not "substantially aligned" with those of the struck employer); *Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d 649 (5th Cir.1966) (same). *Cf. Consolidated Rail Corp. v. Broth. of Maintenance*, 792 F.2d 303 (2d Cir.1986) (no need to exhaust RLA remedies before picketing secondary employer).

We affirm, on jurisdictional grounds, the district court's refusal to enjoin such conduct. 29 U.S.C. § 101.

## I

The appellee in this case, the Brotherhood of Maintenance of Way Employees (BMWE), is a labor organization representing a bargaining unit of maintenance of way employees of the Maine Central Railroad and its wholly-owned subsidiary, the Portland Terminal Company (referred collectively hereafter as the Maine Central). Since April, 1984, BMWE and Maine Central have been engaged in the negotiation of changes to their collective bargaining agreement, but have reached no agreement. The parties exhausted the RLA procedures for "major" dispute resolution[3] and thereafter, on March 3, 1986, the BMWE commenced a strike against the primary carrier-employer, Maine Central. Maine Central attempted to continue operating with supervisory personnel and replacements,[4] which in turn led to the esca-

lation of hostilities by the BMWE. The union extended its picketing to other carriers not directly involved in the dispute with Maine Central. The object of this secondary picketing was to indirectly pressure Maine Central to give in to the BMWE's bargaining demands.

The pickets were initially extended to the Boston & Maine Railroad (B & M), which, like the Maine Central, is owned by Guilford Transportation Industries, Inc. (Guilford), a holding company. B & M interconnects with the Maine Central. Thereafter BMWE also picketed Delaware and Hudson Railway Company (D & H), another Guilford subsidiary, which however is non-connecting.[5] Additional non-affiliated and non-connecting railroads were picketed by BMWE, also with the object of exerting pressure on Maine Central.

Various suits were commenced throughout the country by the several secondary carriers in an attempt to stop the BMWE's secondary picketing. All of these suits, despite some initial successes in the district courts, were ultimately unsuccessful. The courts of appeal held that the secondary picketing was not prohibited by the RLA and could not be enjoined because of the Norris-LaGuardia Act. *See Burlington Northern R. Co., supra; Central Vermont Ry., supra; Richmond, Fredericksburg and Potomac R.R. Co., supra.*

In the meantime, in an apparent attempt to forestall action by the carriers elsewhere, the BMWE filed a declaratory judgment suit in the U.S. District Court in Maine against Guilford, B & M, and D & H, seeking, among other things, a declaration to the effect that its secondary picketing of B & M and D & H was protected activity under the Constitution and the RLA. The carrier-defendants counterclaimed and

---

**3.** 45 U.S.C. §§ 155–160. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

**4.** *See Brotherhood of Railway & Steamship Clerks v. Florida East Coast R.R.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

**5.** Appellee Guilford in its brief raises questions regarding the right to picket these affiliates because of its dispute with Maine Central. We need not enter this quagmire as the district court's decision is not based on the corporate affiliation of appellants to Maine Central, but rather assumes *arguendo* its immateriality. We shall do likewise.

sought injunctive relief to prohibit the secondary activity.

The district court, after hearing D & H's motion for preliminary injunction, ruled that all that was required for the Norris-LaGuardia Act to apply was that there be a labor dispute and that the union continue to act as a labor organization. Finding that both conditions existed in this case, the court in effect concluded that it was immaterial whether or not the interests of D & H and Maine Central were "substantially aligned."[6] Injunctive relief was denied and this appeal ensued.

## II

In 1881 Oliver Wendell Holmes, in his now famous essay, stated that "[t]he life of the law has not been logic; it has been experience."[7] The present situation is a case in point, as much of appellant's argument is based on its perception that it would be illogical to conclude that Congress, in enacting the legislation here in question, intended to permit a relatively small labor dispute in Maine to disrupt railroad transportation activities in other parts of the nation. What Congress may or may not have done is explainable less in terms of logic, than by recounting how this legislation developed. Thus, the issue presented by this case cannot be answered, and the answer cannot be properly supported, without consideration of the events leading up to the passage of the RLA, and subsequent legislation.[8]

At common law, all strikes and pickets, whether primary or secondary, were considered illegal combinations or conspiracies. In the early 18th century most of this activity was subjected to criminal sanctions,[9] an attitude that prevailed until *Commonwealth v. Hunt*[10] ruled that collective labor activity was not a criminal conspiracy. Thereafter, the civil injunction became the principal weapon by which strikes and picketing were suppressed. In issuing injunctive relief against these concerted activities, courts relied on common law principles of nuisance, trespass and interference with advantageous relationships.[11]

Two views soon emerged, both of which were represented in the leading Massachusetts case of *Vegelahn v. Gunter.*[12] In this case the majority held that peaceful picketing to obtain higher wages was an unlawful means of securing a lawful objective. Judge Holmes dissented, arguing that if the object of the activity was lawful, any non-violent means was lawful, even against "third persons." In this stage of development of the law of striking and picketing, no distinction appears to have been drawn between primary and secondary activity.[13]

In 1908, the Supreme Court decided the *Danbury Hatters* case,[14] specifically ruling that both primary and secondary boycotts were actionable in damages pursuant to Section 7 of the Sherman Act.[15] Thereafter the use of the federal courts to enjoin labor disputes became even more prevalent and led to the passage of the Clayton Act in 1914.[16]

In enacting Section 20 of the Clayton

---

**6.** *See Ashley, Drew and Northern Ry., supra; Brotherhood of Railroad Trainmen, supra.*

**7.** Holmes, *The Common Law*, p. 1 (Howe, ed., 1963).

**8.** *See generally* Cox, Bok and Gorman, *Labor Law*, 9th ed. (1981); Note, *Accommodation of the Norris-LaGuardia Act to Other Federal Statutes*, 72 Harv.L.Rev. 354 (1958); Gregory, *Labor and the Law*, 2d ed. (1958); Frankfurter & Greene, *The Labor Injunction* (1930).

**9.** *See, e.g., Commonwealth v. Pullis,* Philadelphia Mayor's Ct., 1806.

**10.** 45 Mass. (4 Met.) 111 (1842).

**11.** *See In re Debs,* 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895).

**12.** 167 Mass. 92 (1896).

**13.** *See Plant v. Woods,* 176 Mass. 492 (1900), (Holmes, J. dissenting).

**14.** *Loewe v. Lawlor,* 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908).

**15.** July 2, 1890, c. 647, 26 Stat. 209.

**16.** 15 U.S.C. §§ 12 *et seq.*

Act,[17] Congress attempted to narrow the jurisdiction of the federal courts by prohibiting injunctions in disputes concerning terms and conditions of employment. Purportedly, the only exception was equitable relief necessary to prevent irreparable injury to property or to a property right. The Supreme Court, however, in *Duplex Printing Press Co. v. Deering,*[18] narrowed Section 20's prohibition on injunctions to disputes between parties in the proximate relation of employer and employee and not to secondary boycotts. Thus secondary activity was held to be enjoinable even after Section 20 was enacted.

Against this background Congress passed the RLA in 1926.[19] Although limited at that time to the railroad industry,[20] the RLA was the first major Congressional recognition of employees' right to organize and to negotiate with employers. The RLA made no mention of secondary boycotts. There are, however, various indications from the text of the statute that the rights and procedures established thereunder were only intended to regulate the relationships between carriers and *their* employees. For example, Section 1, Fifth of the RLA [21] defines the term "employee" as in-cluding "every person in the service of a carrier (subject to *its* continuing authority to supervise and direct the manner of rendition of his service)" (emphasis supplied). Several other sections refer to the carrier(s) and "*its* or their employees." [22] The use of the defined term "employee" throughout the statute strongly suggests that a classical employee-employer relationship was contemplated by Congress.[23]

In our search of the legislative history of the original RLA and its subsequent amendments,[24] we have been unable to find any expressed or implied indication that Congress intended to prohibit the use of secondary activities by a labor organization once the procedures established by the RLA had been exhausted between the union and the carrier with whom negotiations were taking place. In the face of this legislative silence, the conclusion that Congress meant to proscribe such activities can only be reached by surmise and speculation.

The statements of Congressmen Merritt and Berkeley,[25] relied upon by appellants are at best ambiguous, as is that of D.B. Robertson, President of the Brotherhood of Locomotive Firemen & Enginemen.[26] The

---

17. 29 U.S.C. § 52.

18. 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

19. 44 Stat. 577.

20. It was amended in 1936 to include the airline industry. *See* 45 U.S.C. §§ 181–185.

21. 45 U.S.C. § 151, Fifth.

22. Emphasis supplied. *E.g.,* Section 2 (45 U.S.C. § 152) (General duties of carriers and employees to settle disputes), Section 7 (45 U.S.C. § 157) (Arbitration), and Section 10 (45 U.S.C. § 160) (Emergency Board).

23. *E.g.,* Section 3 (45 U.S.C. § 153) (National Railroad Adjustment Board, referred to in the original act as "Boards of Adjustment"), Section 5 (45 U.S.C. § 155) (Mediation Board, Section 4 of original act), and Section 6 (45 U.S.C. § 156) (procedure in changing rates of pay, rules and working conditions). We note in passing that when the RLA was amended in 1936 to include carriers by air, 49 Stat. 1189, similar language was adopted by Congress, *e.g.,* Section 201 ("air

pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to *its* or their continuing authority to supervise and direct the manner of rendition of his service."). 45 U.S.C. § 181. Emphasis supplied. *See also* Sections 202 (45 U.S.C. § 182), 203 (45 U.S.C. § 183), 204 (45 U.S.C. § 184) and 205 (45 U.S.C. § 185).

24. June 7, 1934, c. 426, 48 Stat. 926; June 21, 1934, c. 691, 48 Stat. 1185; June 25, 1936, c. 806, 49 Stat. 1922; Aug. 13, 1940, c. 664, 54 Stat. 785, 786; June 25, 1948, c. 646, 62 Stat. 991; May 24, 1949, c. 139, 63 Stat. 107.

25. 67 Cong.Rec. 4568; 4519 (1926). "Everybody recognizes the absolute importance of the smooth and continued functioning of the railway transportation system. Everybody knows that if that system should be paralyzed even for one week ... national calamity [would result]." (Congressman Merritt, 67 Cong.Rec. 4568 (1926)).

26. The RLA "provides a machinery to promote peace, not a manual of war." *Hearings on H.R. 7180,* 69th Cong., 1st Sess. 191 (1926).

language referred to by appellants, presently contained in 45 U.S.C. § 151a(1), to the effect that the RLA prescribes procedures for the peaceful resolution of *"all disputes concerning rates of pay, rules or working conditions,"* [27] was not in the RLA as enacted in 1926. *See* 44 Stat. 577. In any event, even as it reads today, we must take this language in the light of the definition of the term "employee" previously indicated. That definition establishes that the RLA seeks to regulate *only* the relationships and disputes arising between carriers and those persons "subject to the continuing authority [of the carrier] to supervise and direct the manner of rendition of his services," [28] *e.g.*, persons in an employer-employee relationship.

Appellants' best argument would have been that the Supreme Court's decision in *Duplex Printing* survived the RLA's passage in 1926, thus making it illegal to have a secondary boycott even after its enactment. It is apparent why appellants have not pressed this point, however.

In 1932, Congress enacted the Norris-LaGuardia Act.[29] Section 1 thereof unequivocably states:

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.[30]

Section 2 proceeds to state that in the interpretation of this statute and "in determining the jurisdiction and authority of the courts of the United States ... [it is] the public policy of the United States ... that [employees] shall be free from the interfer-

ence, restraint, or coercion of employees of labor ... in [the effectuation of] concerted activities for the purpose of collective bargaining or other mutual aid or protection.[31] In labor parlance, "concerted activities," of course, includes strikes and secondary boycotts. *See Jacksonville Bulk Terminals, Inc., supra.*

The Norris-LaGuardia Act is anything but vague regarding acts that are *not* subject to the equitable jurisdiction of the courts of the United States. Section 4 specifically deprives federal courts of power to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit the following acts:

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

. . . . .

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified.[32]

This is exactly the conduct that appellants seek to enjoin.

It is Section 13, however, which is most damaging to appellants' contentions. It defines the term "labor dispute" as including:

*any controversy* concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee.*[33]

This provision was specifically enacted to overrule the Supreme Court's decision in *Duplex Printing. See H.R.Rep. No. 669*, 72d Cong., 1st Sess. 10 (1932); *Meat Cut-*

---

27. Emphasis supplied by appellants in their brief.

28. 45 U.S.C. § 151, Fifth.

29. 47 Stat. 70, 29 U.S.C. §§ 101–115.

30. 29 U.S.C. § 101.

31. 29 U.S.C. § 102.

32. 29 U.S.C. § 104(e), (i).

33. 29 U.S.C. § 113(c). Emphasis supplied.

ters Union v. Jewel Tea Co., 381 U.S. 676, 703, 85 S.Ct. 1596, 1610, 14 L.Ed.2d 640 (1965) (Goldberg, J., concurring); *United States v. Hutcheson*, 312 U.S. 219, 229–30, 61 S.Ct. 463, 464–65, 85 L.Ed. 788 (1941); Cox, Bok & Gorman, *Labor Law, supra*, at 55–60. Furthermore, it was intended by Congress that the provision be broadly interpreted. *See Corporate Printing Co., Inc. v. New York Typographical Union No. 6*, 555 F.2d 18 (2d Cir.1977). It has thus been regarded as a limitation against enjoining even controversies whose genesis is political protest, *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (refusal to handle ships of the U.S.S.R. in protest of invasion of Afghanistan), and to cover intraunion disputes. *See Bodecker v. Local Union No. P-46*, 640 F.2d 182 (6th Cir.1983).

More on point, however, it is unquestioned that since its enactment, this section, together with the specific language of the other conditions previously pointed out, deprived federal courts of *any* jurisdiction to enjoin secondary boycotts. *See Iron Workers v. Pauly Jail Bldg. Co.*, 118 F.2d 615, 620 (8th Cir.), *cert. denied*, 314 U.S. 639, 62 S.Ct. 75, 86 L.Ed. 513 (1941); *Wilson & Co. v. Birl*, 105 F.2d 948, 952 (3d Cir.1939); *Cf. Bakery Sales Drivers Local Union No. 33 v. Wagshal*, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed.2d 792 (1948) (where the picketing is not related to a labor dispute the activity may be enjoined). Although the decided cases on the issue of secondary boycotts do not include any carriers or labor organizations covered by the RLA, the language of these decisions places great reliance on the all inclusive language of the Norris-LaGuardia Act prohibition. This reliance is particularly relevant when we consider that the statute was enacted to deal with a specific issue, to control the issuance of injunctions by federal courts in cases of labor disputes, rather than the broader purposes of a general labor law such as the RLA.

Appellants again look to the legislative history of the Norris-LaGuardia Act for support for their contention that secondary boycotts in the railway industry were excluded from its coverage. Congressman Beck proposed an amendment which would have excluded labor disputes in the railroad industry from the proscription of Section 4 of the Norris-LaGuardia Act.[34] In opposition, Congressman LaGuardia stated that this amendment was unnecessary because the RLA "provided a machinery ... for settling labor disputes."[35] The amendment was then defeated. We cannot agree that this incidental exchange is sufficient to defeat the specific and encompassing exclusion of the Norris-LaGuardia Act. The exchange means only that the RLA establishes the procedures which must be followed prior to any strike activity taking place. Once they are exhausted, however, both parties, may resort to self-help, as they have done in this case. However, if they engage in self-help activities before exhaustion of the machinery established for dispute resolution, the action may be enjoined notwithstanding the Norris-LaGuardia Act. It is only because there is such machinery that the Supreme Court has carved out exceptions to the statute. *Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) ("minor" disputes to be submitted to Adjustment Board for compulsory arbitration); *Shore Line R. Co. v. Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) ("major" disputes). *Cf. Boys' Market, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (injunction available to enforce contractual no strike clause if the grievance subject to arbitration). In this case, however, the parties have exhausted the pre-self-help dispute resolution procedures. They are thus free to engage in peaceful conduct to seek improvement of their respective positions.

Congress has not been reticent to prohibit secondary boycotts and to provide injunc-

---

**34.** 75 Cong.Rec. 5503 (Mar. 8, 1932).

**35.** *Id.* at 5499.

tive relief against them when it has considered it advisable.

In 1935 it enacted the National Labor Relations Act (Wagner Act), 49 Stat. 449, whereby the organizational rights of employees were generally recognized throughout the industrial and business sectors of the United States. The statute provided for unfair labor practices by employers, but contained no such prohibitions against labor organizations. Furthermore, the Act did not restrict secondary boycotts or picketing. *See Allen Brudely Co. v. Local 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503 (2d Cir.1942). It was not until the Labor Management Relations Act of 1947 (Taft-Hartley Act), 61 Stat. 140, that Congress mentioned, and thereafter prohibited, secondary boycotts. *See* 29 U.S.C. 158(b)(4).[36] *See generally* Millis & Brown, *From the Wagner Act to Taft Hartley* (1950); Cox, *Some Aspects of the Labor Management Relations Act, 1947*, 61 Harv.L.Rev. 1 (1947). When Congress perceived various loop holes in that statute it proceeded to enact the Landum-Griffin Act in 1959, 73 Stat. 525, 542, 545, and thus prohibited "hot cargo" clauses and similar conduct. 29 U.S.C. § 158(e).

It is significant not only that Congress has known how to specifically enact prohibitions against secondary activity, but also that Congress has not left to private enforcement the enjoining of secondary conduct. Such powers, when permitted, have *only* been granted to a designated federal agency, the National Labor Relations Board. *See* 29 U.S.C. § 160.

From all of the above we conclude that there are indeed some areas in the field of railroad labor relations that have been left unregulated. Whether this state of affairs should be allowed to remain is an affair of state, not a matter for the courts to correct. By now there should be no question that courts are not constitutionally empowered to enact legislation.

We should keep in mind what the Supreme Court stated in *Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 386, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1968), a case in which the issues were closely related to the matters before us:

> No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relation has created no concept more elusive than that of "secondary" conduct; it has drawn no lines more arbitrary, tenuous, and shifting that those separating primary from "secondary" activities.

Citations omitted.

Appellant should seek relief not before this Court, but before Congress.

### III

Lastly, appellants argue that the Norris-LaGuardia Act must be read in context with the Interstate Commerce Act, 49 U.S.C. § 11101 *et seq.*, which establishes a national policy in favor of providing uninterrupted rail transportation. This policy, appellants claim, as expressed in 49 U.S.C. §§ 11101(a) ("A common carrier ... shall provide the transportation or service on reasonable request") and 10741 (prohibitions against discrimination by common carrier), permits the issuance of an injunction to prevent secondary picketing. To say the least, this argument is far-fetched.

It is clear from reading the Interstate Commerce Act, that it is principally a *carrier*-regulatory statute. *See* 49 U.S.C. §§ 10101, 10101a. It is not a labor law, nor is it intended to control in any manner the

---

**36.** Interestingly enough, during the debates for the enactment of the Taft-Hartley Act, Senator Taft was of the view that secondary boycotts by railroad employees were protected by the RLA.

93 Cong.Rec. 6498, 2 Legislative History of the Labor Management Relations Act, 1947, p. 1571.

conduct which is permissible in a labor dispute. Although a common carrier cannot under the statute refuse to handle cargo or provide transportation to passengers for discriminatory reasons,[37] there is nothing in the statute that imposes obligations on the carrier, if prevented by any *force majeure* from meeting its statutory duties. Picketing of the nature here in question may well be *force majeure*.[38] If appellants are entitled to injunctive relief against secondary picketing because it interferes with a carrier's duties under the Interstate Commerce Act, they are equally entitled to such relief against primary picketing, which is just as disruptive of interstate commerce. Obviously, such an argument cannot be seriously made.

We thus agree with our brethren of the Seventh Circuit that the Interstate Commerce Act does not provide leave to ignore the proscriptions of the Norris-LaGuardia Act. *Burlington Northern R. Co., supra,* 793 F.2d at 800. *See also Order of Railroad Telegraphics v. Chicago & N.W. Ry.,* 362 U.S. 330, 339, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960); *Milk Wagon Drivers' Union v. Lake Valley Co.,* 311 U.S. 91, 103, 61 S.Ct. 122, 128, 85 L.Ed. 63 (1940).

The order of the district court denying injunctive relief is *affirmed.*

---

**37.** Just as it could not at common law. *See American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway Co.,* 387 U.S. 397, 406, 87 S.Ct. 1608, 1613, 18 L.Ed.2d 847 (1967).

**38.** *See Mishara Constr. Co. v. Transit-Mixed Concrete Corp.,* 365 Mass. 122, 310 N.E.2d 363 (Mass.1974) (recognizing that when labor dispute is unexpected and occurrence of the dispute presents unusual difficulty "the excuse of impracticability may well be applicable").