INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and its District Lodge 100, Plaintiffs, Appellees,

v.

EASTERN AIR LINES, INC., Defendant, Appellant.

No. 87–1408.

United States Court of Appeals, First Circuit.

Heard June 3, 1987.

Decided Aug. 18, 1987.

Loyd M. Starrett, P.C., with whom Steven M. Sayers, David M. McCarthy and Fordham & Starrett, Boston, Mass., were on brief, for defendant, appellant.

Harold L. Lichten, with whom Warren H. Pyle, Larry Engelstein and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, Mass., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and RE,* Judge.

* Chief Judge of the United States Court of International Trade, sitting by designation.

TORRUELLA, Circuit Judge.

■ The question presented by this appeal is whether a district court has jurisdiction to enter a *status quo* injunction in a minor dispute[1] under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA), pending the outcome of a grievance which is being arbitrated. We rule that, absent exigent circumstances not present in this case, "[n]o court of the United States [has] jurisdiction," to entertain such an action. 29 U.S.C. § 101 *et seq.*

*Factual background*

Appellees in this case, the International Association of Machinists and Aerospace Workers, and its District Lodge 100 (IAM), represent the mechanics and maintenance employees of appellant Eastern Air Lines, Inc. (EAL) throughout the United States and Canada. One shop employing these job classifications is located at Logan International Airport in Boston, Massachusetts.

The IAM and EAL entered into a collective bargaining agreement which among other things provides for a detailed grievance procedure (Article 17–*Grievance Procedure;* Article 18–*Investigation and Hearing Re: Discharge or Suspension*), culminating in mandatory and binding arbitration (Article 19–*System Board of Adjustment*). This procedure covers "disputes between any employee covered by this Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of this Agreement" (Article 19 D.).

On April 17, 1987, EAL notified approximately 68 bargaining unit members performing maintenance and mechanic work at Logan Airport that they were being laid off effective May 5, 1987. The apparent reason for this action was the reduction in EAL's maintenance operation in Boston as part of a company-wide economy drive.

The IAM filed grievances questioning the layoffs because they were allegedly in violation of the collective bargaining agreement. The General Chairman of the IAM also contacted EAL management and challenged the layoffs as contrary to Article 20, Sections C and D (transfers because of geographic relocation of work),[2] Article 28, Section A (lateral transfer procedure) and Appendix No. 1 (job security and full utilization of employees)[3] of the collective

---

1. A "minor" dispute is one concerning the resolution of grievances regarding the interpretation or application of an existing collective agreement, in contrast to a "major" dispute which is one arising from the formation or negotiation of changes to such contracts. *Railway Labor Executives Ass'n v. Boston & Maine Corp.,* 808 F.2d 150, 152 n. 1 (1st Cir.1986).

2. Article 20:
   C. In transferring an employee hereunder from one station to another, the Company shall furnish space available transportation to extent permitted by law for the employee affected, and for members of his immediate family, from the point on the system where he is at that time located to point to which he is transferring, and shall pay moving expenses for household goods and personal belongings, subject to the maximum established by the Company. If the employee is traveling by car, the Company shall pay for meals and lodging, and for gas and oil for the employee's car while en route, subject to the maximum established by the Company. An employee shall not be required to travel by car more than 350 miles per day.
   D. In the event of the geographical relocation in whole or in part of the work performed by employees covered by this Agreement, representatives of the Company and the Union will meet without delay to negotiate for the transfer of employees affected.
   Employees who are required to change geographical locations as the result of the Company's relocating their work shall be reimbursed for moving expenses to their new locations in accordance with the maximum allowable by Standard Practice 50–407, dated December 5, 1978, or any improvement thereto. In any such geographical relocation of work, senior qualified employees at the affected location will be afforded an opportunity to transfer to the new location and shall be reimbursed for moving expenses hereunder. In the event the number of senior qualified volunteers is not sufficient, the junior qualified employees will be reassigned to the new geographical location. In the event the junior employee(s) decline such relocation, he (they) will be placed in lay-off status in accordance with the provisions of the EAL–IAM Agreement.

3. Appendix No. 1 reads in part:
   A. Any restructuring of work rules or productivity gains resulting from the current negotiations of the EAL–IAM Agreement will not result in loss of jobs for current employees.
   B. The Company agrees not to lay off any employee who has completed one (1) year with the Company on the date of ratification.

bargaining agreement, and sought also to have the company rescind the layoff notices and to arbitrate the disputes in an expedited manner. The IAM contended that Appendix No. 1 prevented EAL from laying off employees with more than one year seniority on the date of the contract signing (May 16, 1985), and that Article 20 C and D required EAL to "immediately notify and negotiate with the [IAM] to arrange for the transfer of employees to a location where such relocated work is being performed." Complaint, ¶ 8. EAL responded that Appendix No. 1 was not violated because the laid off Boston employees had "bumping" (*i.e.*, seniority displacement) rights over employees in similar jobs within EAL's system in other locations,[4] and contended that Article 20 C and D did not apply because EAL had not geographically relocated work but rather "merely eliminat[ed] ... positions for which there is no longer any need in Boston." Affidavit of John S. MacDonald, ¶¶ 10–11, 17.

Without first exhausting the contractual grievance and arbitration procedures, the IAM filed an action in the United States District Court for Massachusetts seeking injunctive relief "to prevent [EAL] from changing the status quo in this 'major dispute'" pending compliance with the RLA, and in the alternative, to maintain this status quo "pending the submission of this dispute to the System Board of Adjustment in order to prevent irreparable harm to the [IAM's] members." Complaint, ¶ I.

The district court, in an unpublished opinion, concluded that the controversy was in fact a minor dispute because it concerned "[d]isagreements over the 'meaning or coverage' of an existing contractual provision." *International Association of Machinists and Aerospace Workers, et al. v. Eastern Air Lines, Inc.*, No. 87–1106–5, slip op. at 2 (D.Mass. May 4, 1987). Furthermore, the court concluded that it could not be said "that [EAL's] position is so meritless as to constitute a unilateral rewriting of the collective bargaining agreement." *Id.* However, relying on a series of cases, mainly from the Second Circuit,[5] the court ruled that notwithstanding that a minor dispute was involved, a preliminary injunction to maintain the status quo could be issued "if the union makes a showing of the traditional requirements for preliminary injunctive relief." *See Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). The court then proceeded to consider the various requirements of *Planned Parenthood* for the issuance of injunctive relief, finding that the IAM's membership would suffer irreparable harm if the injunction did not issue, that such injury would outweigh any harm caused to EAL by the issuance of this relief, and that the public interest would not be adversely affected by such action. *Id.* at 4–5. As to the fourth requirement under *Planned Parenthood*, *i.e.*, that plaintiff exhibit a

---

This commitment will not prevent the Company from making normal seasonal adjustments in Sales and Services station manpower requirements provided that employees so affected have an opportunity to continue in active employment by exercising their seniority at other locations and/or voluntarily stepping back into a lower classification.

Layoffs resulting from a strike, government action or any other circumstance over which the Company has no control will nullify the above during the period that such a circumstance is in effect.

C. The Company further agrees that where any change in market presence substantially reduces flights at a station on a long-term basis, the Company will put into place an incentive relocation plan in accordance with the plan used during 1984 in Houston to assist employees laid off, to defray moving expenses.

D. Where the Company contemplates a need to reduce personnel or a need to accommodate reassignment of surplus personnel, a one-time offer as provided below is agreed to by the Company and Union: ...

4. The layoff notice made reference to these rights and how they could be exercised.

5. *Local 533, Transport Workers Union of America, AFL–CIO v. Eastern Air Lines, Inc.*, 695 F.2d 668, 675 (2d Cir.1982); *United Transport Union v. Burlington Northern Inc.*, 458 F.2d 354, 357 (8th Cir.1972); *Westchester Lodge 2186, etc. v. Railway Express Agency, Inc.*, 329 F.2d 748, 750 (2d Cir.1964); *International Association of Machinists and Aerospace Workers, AFL–CIO v. Trans World Airlines, Inc.*, 601 F.Supp. 1363, 1371 (W.D.Mo.1985).

likelihood of success on the merits, the district court "intentionally refrain[ed] from making a prediction as to the likelihood of success because consideration of the merits of the dispute in any respect has clearly been excluded from the jurisdiction of this court." *Id.* at 5. These conclusions were substantially reaffirmed by the district court in another unpublished memorandum denying EAL's request for reconsideration, in which the court cited as additional authority for issuance of the status quo injunction the Supreme Court's rulings in *Brotherhood of Railway Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) and *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) and this circuit's holdings in *Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.), *cert. denied,* 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981) and *International Association of Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 555 n. 7 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972).

The district court issued a preliminary injunction against EAL prohibiting it from laying off the 68 employees in question "pending disposition of the grievances growing out of the Work Force Reduction/Displacement program ... by the Systems Board of Adjustment." It also enjoined EAL "from terminating any such employee's option to relocate until a reasonable time after the decision of the Systems Board of Adjustment."

We must vacate the district court's issuance of the preliminary injunction for two reasons: (1) the district court improperly applied the standards established by *Planned Parenthood* for the issuance of such relief, and (2) the district court lacks jurisdiction over the subject matter of this suit pursuant to the proscriptions of the Norris-La Guardia Act, 29 U.S.C. §§ 101 *et seq.*

*The misapplication of the Planned Parenthood standards*

Although we would normally not comment upon this issue in view of our jurisdic-

tional holding, *post,* it is important that we do so in this case to prevent incorrect application of the injunctive standards which we have established in this important area of the law.

■ It is patently anomalous that in issuing the preliminary injunction the district court on the one hand invoked compliance with the standards of *Planned Parenthood,* yet contemporaneously exempted the moving party to that proceeding from a most important imperative under those standards, that of showing that there was a likelihood of prevailing when the case is heard on the merits. *Planned Parenthood, supra,* 641 F.2d at 1009. The district court reached this conclusion because it apparently confused the proscription against consideration of the merits of the matters being submitted to arbitration, with determining likelihood of success on the *merits of the case before it.* The court most decidedly had jurisdiction to entertain whether there was a probability of success *on the injunction.* Elimination of such a requirement would emasculate the *Planned Parenthood* standard and revive the ancient conflicts between chancery and the courts of law in which equity was used to circumvent the legal rights of the parties. *See* Leubsdorf, *The Standard for Preliminary Injunction,* 91 Harv.L.Rev. 525 (1978).

It must be remembered that the granting of interlocutory injunctive relief is a drastic procedure. It is a temporary remedy allowed at a time when the parties have not had full opportunity to present their case to the court, nor has the court, conversely, had the benefit of a full trial and deliberation. It is thus very important that the standards of *Planned Parenthood,* which are designed to grant the parties a minimum of due process in a dynamic environment, be fully complied with. Without downgrading the other three requirements of *Planned Parenthood,* there can be little doubt that granting preliminary injunctive relief to a party whose chances of receiving permanent injunctive relief when the case

is heard on the full merits, are minimal, is most inappropriate.

In this case, the likelihood of success[6] on the merits of the permanent injunction is nil, as the district court lacks subject matter jurisdiction. 29 U.S.C. § 101.

*Minor disputes and the Norris-La Guardia Act*

■ Because we have before us a "minor" dispute under the RLA, this in itself raises a strong presumption that it is the type of controversy mandated by Congress to be resolved outside the judicial system. *Atchison, Topeka and Santa Fe Ry. Co. v. Buell,* —— U.S. ——, 107 S.Ct. 1410, 1414 n. 9, 94 L.Ed.2d 563 (1987) ("Congress considered it essential to keep so-called 'minor' disputes within the Adjustment Board and out of the courts."). In addition to that, a controversy which is covered by the RLA can also be a "labor dispute" subject to the proscriptions of the Norris-La Guardia Act. 29 U.S.C. §§ 101 *et seq. Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees,* —— U.S. ——, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987); *Broth. of Maintenance of Way v. Guilford Transp.,* 803 F.2d 1228 (1st Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1972, 95 L.Ed.2d 813 (1987).

There are few situations in which Congress has been more explicit in depriving federal courts of subject matter jurisdiction than those involving the issuance of equitable relief in labor disputes. Thus, Section 1 of the Norris-La Guardia Act unequivocally states that:

No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of a labor dispute, except in strict con-

formity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. The policy against judicial involvement in labor disputes by way of injunctive relief is so strong that not even the specter of a national paralysis of the railroads by reason of secondary boycotts was considered sufficient to overcome Congress' withdrawal of jurisdiction. *Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees, supra; Broth. of Maintenance of Way v. Guilford Transp., supra.*

In examining the issue at hand we must keep in mind that the Norris-La Guardia Act defines "labor dispute" to include "any controversy concerning terms or conditions of employment," 29 U.S.C. § 113(c). This expression is to be broadly and liberally construed. *See Corporate Printing Co., Inc. v. New York Typographical Union No. 6, etc.,* 555 F.2d 18 (2d Cir.1977); *United Electric Coal Companies v. Rice,* 80 F.2d 1 (7th Cir.1935). *Cf. Marriott Corp. v. Great America Service Trades Council,* 552 F.2d 176 (7th Cir.1977). In fact the term "labor dispute" has a broader meaning for purposes of the Norris-La Guardia Act than for the RLA. *Terminal R.R. Ass'n of St. Louis v. Brotherhood of Ry.,* 458 F.Supp. 100 (E.D.Mo.1978). There should be no doubt that the controversy between IAM and EAL created by the layoff of the 68 mechanics is a classical labor dispute and thus within the Norris-La Guardia Act's proscription,[7] unless it falls within the limited exceptions to this statute.

---

**6.** This standard has been variously labeled by other courts outside the First Circuit as "reasonable certainty," *Sierra Club v. Hickel,* 433 F.2d 24 (9th Cir.1970), *aff'd sub nom., Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), "substantial probability," *Minnesota Bearing Co. v. White Motor Corp.,* 470 F.2d 1323 (8th Cir.1973), "clear showing of probable success," *Dopp v. Franklin National Bank,* 461 F.2d 873 (2d Cir.1972), "likelihood," *Tele-Controls, Inc. v. Ford Industries, Inc.,* 388 F.2d 48 (7th Cir.1967), and, "reasonable probability of suc-

cess," *Automated Marketing Systems, Inc. v. Martin,* 467 F.2d 1181 (10th Cir.1972). We have not discerned any marked difference in application of these variously described standards from our "likelihood of success" criteria.

**7.** Contra, *Hilbert v. Pennsylvania Railroad Company,* 290 F.2d 881, 884 (7th Cir.), *cert. denied,* 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961); *Westchester Lodge 2186, etc. v. Railway Express Agency, Inc.,* 329 F.2d 748 (2d Cir.1964).

As demonstrated by the Supreme Court's action in *Burlington Northern R. Co., supra,* exceptions to the Norris-La Guardia Act's prohibitions are limited, particularly those created by judicial fiat. This is so because the statute was passed with the very clear congressional intent to end, or at least severely restrict, injunctive interference in labor relations, and to make plain that such intent was not to be frustrated by judicial construction or inventiveness. *Texas & N.O.R. Co. v. Brotherhood of R.R. Trainmen,* 307 F.2d 151 (5th Cir.1962), *cert. denied,* 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963).

■ Statutory exceptions to the withdrawal of injunctive jurisdiction, such as those contained in Section 7 of Norris-La Guardia, 29 U.S.C. § 107 (concerning mostly uncontrollable unlawful acts), those found in Section 10 of the National Labor Relations Act, 29 U.S.C. § 160 (prevention of unfair labor practices),[8] and those in the statute authorizing injunctions during national emergencies, 29 U.S.C. § 178,[9] are not common. Judicially created exceptions to the anti-injunction ban are equally rare. In disputes governed by Section 301(a) of the Taft-Hartley Act, 29 U.S.C. § 185(a), injunctions may be issued to compel arbitration, *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 457–59, 77 S.Ct. 912, 918–19, 1 L.Ed.2d 972 (1957), or enforce no strike or lockout clauses, *Boys Markets v. Clerks Union,* 398 U.S. 235, 249–53, 90 S.Ct. 1583, 1591–94, 26 L.Ed.2d 199 (1970). In disputes governed by the RLA, injunctions may be issued to prevent the violation of specific mandates in the RLA. *Burlington Northern R. Co., supra,* 107 S.Ct. at 1851; *Chicago & N.W.R. Co. v. Transportation Union,* 402 U.S. 570, 581–84, 91 S.Ct. 1731, 1737–39, 29 L.Ed.2d 187 (1971) (failure to maintain *status quo* pending exhaustion of mandatory mediation procedures in a "major dispute"); *Shore Line v. Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (same); *Brotherhood of Railroad Trainmen v. Chicago*

*River & Ind. R. Co.,* 353 U.S. 30, 39–42, 77 S.Ct. 635, 639–41, 1 L.Ed.2d 622 (1957) (statutory duty to arbitrate "minor dispute"); *Railroad Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 1025–26, 96 L.Ed. 1283 (1952) (nondiscriminatory representation of employees by their statutory representative); *Virginian R. Co. v. System Federation,* 300 U.S. 515, 549, 57 S.Ct. 592, 600, 81 L.Ed. 789 (1937) (compliance with provisions for certification of a bargaining representative); *Railway Labor Executives Ass'n v. Boston & Maine Corp.,* 808 F.2d 150, 157–58 (1st Cir.1986) (discharge in retaliation of employees engaging in statutorily protected activity). "Even when a violation of a specific mandate of the RLA is shown, '[c]ourts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right'." *Burlington Northern R. Co., supra,* 107 S.Ct. at 1851 (citations omitted). The issuance of the injunction in this case takes place without reference to any statutory mandate in the RLA. Nor can we find any to justify said action.

The action of the district court contravenes what we recently said in *Broth. of Loco. Eng. v. Boston & Maine Corp.,* 788 F.2d 794, 797 (1st Cir.1986), to the effect that "['minor] disputes' are entrusted exclusively to arbitration by the National Railroad Adjustment Board ... [and that a] district court has no jurisdiction over such disputes, and thus a party may not obtain a status quo injunction. *Carbone,* 645 F.2d at 98." The district court, although acknowledging this decision, concluded that "in light of the court of appeals' citation to its decision in *Carbone* [*Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.1981) ], and its use of the phrase 'status quo injunction', I take this statement to refer to the automatic status quo injunction required by section 156 of the RLA ["major" disputes] and not to a traditional pre-

---

**8.** Section 10(h), 29 U.S.C. § 160(h), specifically exempts application of the Norris-La Guardia Act.

**9.** These injunctions are also specifically excluded from Norris-La Guardia coverage. 29 U.S.C. § 178(b).

liminary injunction in equity." This reasoning is erroneous.

First, we have already indicated that the Norris-La Guardia Act has withdrawn from courts of the United States the power to issue "a traditional preliminary injunction in equity" in the context of a labor dispute. *See ante.* In the case of a labor dispute a court of the United States has no *traditional* preliminary injunctive power.

Even less on point, however, is the district court's characterization of what this court did in *Boston & Maine.* The union there, as in the present case, sought declaratory and injunctive relief claiming that a "major" dispute existed because of operational changes instituted by the railroad. The district court dismissed for want of subject matter jurisdiction, deciding that the union had not raised a "major" dispute under the RLA. In ruling upon this question on appeal, we agreed with the conclusion of the district court that this was a minor dispute. *Id.* at 797. The previously quoted language to the effect that district courts lacked jurisdiction to issue status quo injunctions in minor disputes, followed. Our citation reference to *Carbone* does not warrant the district court's limited interpretation of our decision, particularly in view of the footnote which is part of the citation, indicating that "[a] carrier may therefore continue to apply its interpretation of the agreement during the pendency of a minor dispute ..." *Id.* at 797 n. 5. Thus taken in its full context, *Boston & Maine* stands for the proposition that if there is a difference in contract interpretation between a union and a carrier, such a "minor" dispute can only be submitted to

decision by the systems adjustment board, and during the pendency of arbitration, the courts lack jurisdiction to prevent the carrier from continuing to act as it understands the contract.[10]

The district court's interpretation of *Carbone* is also somewhat misplaced. In *Carbone*, the Union, alleging that the carrier's personnel reduction constituted a breach of the parties' collective bargaining agreement, obtained a preliminary injunction in the district court, requiring the carrier to reestablish the position that had been eliminated. *Carbone, supra,* 645 F.2d at 97. We reversed and ordered the dissolution of the injunction on the grounds that, as in *Boston & Maine*, the controversy was a "minor" dispute over which the district court had no jurisdiction. *Id.* at 98 ("The initial, and dispositive question is jurisdictional."). We ruled that,

> [T]here may be a violation of the contract, but this is a question of interpretation, and as such is outside of our jurisdiction. Were it otherwise, "the arbitration machinery mandated by the Railway Labor Act [would] be dealt a crippling blow."

*Id.* at 100 (citations omitted).

We concede that the district court's error was probably induced by dicta in *Carbone* which could be interpreted to mean that, even in a "minor" dispute, a status quo injunction can issue upon a showing of irreparable harm prior to the arbitration taking place.[11] But the court in *Carbone* cited *Order of Railway Conductors v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946), as authority for this prop-

---

**10.** Unless the carrier's interpretation is so insubstantial as to warrant the inference that it constitutes a unilateral amendment to the contract without compliance with RLA procedures. *See Airlines Stewards & Stewardesses Ass'n v. Caribbean Atlantic Airlines, Inc.,* 412 F.2d 289, 291 (1st Cir.1969).

**11.** The precise language in *Carbone* which may be considered somewhat misleading is found at 645 F.2d at 98:

> No injunction may issue without the traditional showing of irreparable harm. *Order of Railway Conductors v. Pitney,* 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946);

*United Transportation Union v. Burlington Northern Inc., ante,* 458 F.2d at 357.

The *Carbone* dicta led to additional dicta in *Boston & Maine Corp. v. Lenfest,* 799 F.2d 795, 801 (1st Cir.1986), which although not relied upon by the district court, is supportive of its conclusion. In *Lenfest* we stated in dicta (the Court ruled that a "minor" dispute under the RLA was not involved but rather § 10(b) of Federal Railroad Safety Act, 45 U.S.C. § 441(b)), that status quo injunctive relief was available in both "minor" and "major" disputes. *Id.* As authority for this dicta we cited *Carbone* at page 98, which, as indicated *post,* improperly relies on *Pitney* for this conclusion.

osition, a careful reading of which indicates that the court was referring to injunctive relief *after* the award in a "minor" dispute, to enforce the award:

> Certainly the extraordinary relief of an injunction should be withheld, at least, until then. Only *after* the Adjustment Board acts, *but not until then,* can it plainly appear that such relief is necessary to insure compliance with the statute. Until such time, [the moving party] cannot show irreparable loss and inadequacy of the legal remedy. The court of equity should, therefore, in the exercise of its discretion stay its hand.

*Id.* at 567 (emphasis supplied, citations omitted).[12] Issuing injunctive relief to *enforce* an award is, of course, a totally different proposition than issuing an injunction *pendente lite.* The latter cannot take place in case of a "minor" dispute.

The present case is practically identical to *Boston & Maine* and *Carbone.* The Union seeks an injunction to prevent the employer from taking action. The effect of the status quo injunction would be a preliminary decision on the merits of that dispute, because the injunction would mean that the Union's view would prevail pending the outcome of the arbitration. This is not only totally foreign to traditional labor relations (*i.e.,* employer acts, union files grievance, arbitrator decides), but also places the employer in an untenable position. If the Union wins the grievance before the systems board, the board has full authority to make all of the affected employees whole. *Cf. Walsh v. Union Pacific Railroad Co.,* 803 F.2d 412, 413–14 (8th Cir.1986); *Lynchburg Foundry Co. v. United Steelworkers of America,* 404 F.2d 259, 261 (4th Cir.1968). *See also International Brotherhood of Firemen & Oilers v. Consolidated Rail Corp.,* 560 F.Supp. 169, 178 (S.D.Ohio 1982); *Independent Union of Flight Attendants v. Pan American Airways,* 502 F.Supp. 1013, 1017 (D.D. C.1980).

The inconveniences and delays suffered by the grievants, which are undeniably real, are those to be expected in any litigation. On the other hand, if the grievance is won by the company while enjoined from acting, the losses suffered by reason of the judicial interference will remain uncompensated. Injunctive relief pending arbitration of a minor dispute does not maintain the status quo because the status quo of labor relations is that which allows the grievance to be litigated *after* action by the employee. *See Railway Labor Executives Ass'n, supra,* 808 F.2d at 156 ("[i]t is the 'actual, objective working conditions and practices, broadly conceived', existing on [a certain] date that are the standard for the parties' *status quo* obligations"). Can it seriously be questioned that, absent a specific contractual prohibition, an employer can discharge an employee for disciplinary reasons without waiting for the outcome of the resultant arbitration proceedings? Yet such an employee, even if he ultimately wins and is reinstated by the arbitrator with full back pay, will be at least as seriously affected as the employees laid off under the present circumstances.

The granting of the preliminary injunction in this case gave the IAM an advantage that neither the law, the collective bargaining agreement, nor labor relations practice contemplates. *Order of R. Telegraphers v. Leighty,* 298 F.2d 17, 21 (4th Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962) ("Whatever merits this solution may have, a court injunction would not be an act of neutrality."). If, as is alleged, the procedure establishing the systems adjustment boards are inadequate for the expeditious handling of grievances, the answer to this problem is not through judicial intervention in the reformation of a collective bargaining agreement, but rather through the renegotiation of these provisions when the appropriate time arises. This is a private matter between the negotiating parties in which the courts have no business intervening. *See General Committee of Adjustment v. Mis-*

---

**12.** The court also cited *United Transportation Union v. Burlington Northern Inc.,* 458 F.2d 354, 357 (8th Cir.1972), a case which also relies on *Pitney* for this position, and is thus subject to our analysis of *Pitney. Id.* at 357 n. 3.

*souri-Kansas-Texas Railroad Co.,* 320 U.S. 323, 330, 337, 64 S.Ct. 146, 149–50, 88 L.Ed. 76 (1943); *Elgin, Joliet & Eastern R. Co. v. Burley,* 325 U.S. 711, 752, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting) (The industrial controversies of the railroad community "were certainly not expected to be solved by ill-adopted judicial interferences, escape from which was indeed one of the driving motives in establishing specialized machinery of mediation and arbitration."). Faced with similar allegations the court stated in *Lanfried v. Terminal Railroad Association of St. Louis,* 721 F.2d 254 (8th Cir.1983), *cert. denied,* 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984):

> Each of the plaintiffs is processing his grievance through the appropriate administrative procedures. Each has the opportunity to pursue these procedures further. Plaintiffs argue, however, that review of their claims by the Adjustment Board is a lengthy and cumbersome proceeding with delays of two years or more. That such delays exist, if in fact they do, is regrettable. But such matters are properly the subject of congressional concern. It would be unsound for this court to make the question whether plaintiffs can maintain this action in the federal courts depend upon our determination as to how effectively the Adjustment Board is performing its congressionally mandated task.

*Id.* at 256 (citations omitted).

The district court and the IAM relied on several cases to sustain the validity of this injunctive relief. Because of the importance of this case we will explain why we find those cases inapposite.

We commence with *Brotherhood of Railway Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). In that case, after negotiations had failed over the resolution of several "minor" disputes, the carrier submitted the issues to resolution by the adjustment board. The Union called a strike over those issues, which strike was permanently enjoined. The Court sustained the injunction, even against a challenge under the Norris-La Guardia Act, because it held that the strike violated a specific statutory provision of the RLA, namely that providing for mandatory arbitration of "minor" disputes. *Id.* at 34–39, 77 S.Ct. at 637–39. This case does not stand for the proposition that status quo injunctions can issue in "minor" disputes but rather is part of a continuum of cases that hold that notwithstanding the Norris-La Guardia Act, injunctions can issue to prevent violation to specific provisions of the RLA. *See* at 1146.

*Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.,* 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) is closer to the mark, yet falls short. There the court held that if a carrier sought the equitable aid of the courts to enjoin a strike pending arbitration of a "minor" dispute, *"[i]f the District Court is free to exercise the typical powers of a court of equity,* it has the power to impose conditions requiring maintenance of the *status quo." Id.* at 531, 80 S.Ct. at 1328–29 (emphasis supplied). The issue was therefore different than in the present case; the issue was whether an injunction granted to prevent a strike could be qualified by conditions imposed by the district court. *Id.* The court specifically excluded the issue presently before us:

> We do not decide here, whether a federal court can, during the pendency of a dispute before the Board, enjoin a carrier from effectuating the changes which gave rise to and constitute the subject matter of the dispute, independently of any suit by the railroad for equitable relief …

*Id.* 363 U.S. at 531 n. 3, 80 S.Ct. at 1329 n. 3. As in *Chicago River,* the basic point of this case is that the underlying injunction that was issued was to preserve a specific statutory right under the RLA. The Court held that the conditions imposed in the issuance of this injunction, *where jurisdiction already existed in the court to so act,* were appropriate just as in any case in equity in which the trial court attempts to reduce the possible damage to the parties. This imposition was no different than requiring the posting of a bond.

It may be "illogical," as the district court and appellee claim, to grant this relief only when a union has struck and not otherwise,

but we have on other occasions commented that "logic" is not always the best road map to following the intricacies of the relationship between the RLA and the Norris-La Guardia Act. *See Guilford Transportation Industries, supra,* 803 F.2d at 1230. There are lacunas in our jurisdictional power which have been left open by Congress. *Burlington Northern R. Co.,* 107 S.Ct. at 1852. It is Congress that must cover the gap, not the courts.

As previously indicated there are some circuit court decisions which, mostly in dicta, have sympathized with appellee's position. These include our own *International Association of Machinists v. Northeastern Air Lines, Inc.,* 473 F.2d 549, 555 n. 7 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972), in which we affirmed the district court's refusal to compel an airline to negotiate concerning a proposed merger with another airline. The union was relying on a provision of the collective bargaining agreement as imposing such an obligation but had "not placed the matter before the System Adjustment Board." *Id.* at 555. We stated that "[s]ince the purpose of an injunction is to preserve the jurisdiction of the Board, this is an inappropriate case to grant such relief." *Id.* (citations omitted). Interestingly enough among the authorities cited for such a proposition was Section 8 of the Norris-La Guardia Act, 29 U.S.C. § 108, which thus indicates the applicability of that statute to the present circumstances. More in point however, was the unwillingness of the court to allow issuance of an injunction in a situation in which for all practical purposes, if the merger went through, the collective bargaining unit would cease to exist.[13] This is much more drastic a result than the present case in which, notwithstanding the alleged hardships, an award will make the affected employees substantially whole, and the employer will not disappear. Although appellees point to footnote *dicta, id.* at 555 n. 7, in which we indicate "that the same policies which led the Supreme Court to hold that a court may condition an anti-strike injunction on

maintenance of the status quo ... *may* also require that a union be able to enjoin changes in working conditions *if it would be impossible otherwise later to make the workers whole* " (emphasis supplied; citations omitted), apart from the non-mandatory nature of this language, it is couched in conditions precedent to its application which are not, in any event, present in this appeal. Appellees also apparently overlooked the court's intimation to the possibility of "pursu[ing] some quite different arguments that occur to us that might militate against an injunction if the matter *were* before the Board," *id.* at 555 n. 8, arguments which we have explored in this case and which we find more persuasive than the various dicta upon which the district court relied upon for its actions in this case. We thus find *International Association Machinists v. Northeastern Air Lines, Inc., supra,* not to be controlling.[14]

The dicta in *Westchester Lodge 2186 v. Railway Express Agency, Inc.,* 329 F.2d 748 (2d Cir.1964), stands on equal footing, although again it refers to the limited situation of a status quo injunction in a minor dispute, issued "to preserve the jurisdiction of the Adjustment board," *id.* at 753, a situation which is different from the present case. That case is one of a line of Second Circuit cases following such dicta. *See Local 553 Transport Workers v. Eastern Air Lines, Inc.,* 695 F.2d 668, 675 (2d Cir.1982) (dicta) ("[I]f the dispute is minor, a status quo injunction is appropriate only in those instances when it appears that its absence would prevent the Adjustment Board from giving a significant remedy to the side that prevails before the board."). *See also United Transport Union v. Burlington Northern Inc.,* 458 F.2d 354, 357 (8th Cir.1972) (dicta) (*see ante* at p. 7 n. 5). Although in *Brotherhood of Railway, etc. Employees v. Railway Express Agency,* 409 F.2d 312 (2d Cir.1969), the issue was squarely presented to the court, it appears that the carrier conceded the power of the court to issue the status quo injunction and only argued the lack of irreparable injury by the union. *Id.* at 316.

---

**13.** Of course, because of financial difficulties, if the merger failed, this result was also a possibility.

**14.** *See also* footnote 11 *ante* regarding *Boston & Maine Corp. v. Lenfest, supra.*

The Second Circuit's view has been rejected by several other circuits including the District of Columbia, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits. *See Brotherhood of Railway Carmen v. Norfolk and Western Railway Co.,* 745 F.2d 370, 378 (6th Cir.1984); *Chambers v. Burlington Northern, Inc.,* 692 F.2d 109, 112 (10th Cir.1982); *Empresa Ecuatoriana De Aviación, S.A. v. District Lodge No. 100,* 690 F.2d 838, 844, *reh'g denied* 696 F.2d 1007 (11th Cir.1982), *cert. dismissed* 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983); *Brotherhood of Railway Carmen v. Pacific Fruit Express Co.,* 651 F.2d 651, 653 (9th Cir.1981); *United Transportation Union General Committee v. Baker,* 499 F.2d 727, 728–29, 732 (7th Cir.), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974); *International Brotherhood of Electrical Workers v. Washington Terminal Co.,* 473 F.2d 1156, 1167–68 (D.C.Cir. 1972), *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973); *Brotherhood of Locomotive F. & E. v. Southern Pacific Co. (T. & L.L.),* 447 F.2d 1127, 1132, 1136 (5th Cir.1971); *Pickett v. New York Central Railroad,* 332 F.2d 968, 970 (7th Cir. 1964). The correct rule was well stated by the Court of Appeals for the Fifth Circuit in *International Association of Machinists v. Frontier Airlines, Inc.,* 664 F.2d 538, 541 (5th Cir.1981):

> [I]njunctive relief is inappropriate in a "minor" dispute case, because the statutorily established grievance procedures are mandatory and exclusive. *See Andrews v. Louisville & Nashville Railroad Company,* 406 U.S. 320, 322–25, 92 S.Ct. 1562, 1564–65, 32 L.Ed.2d 95 (1972). The Act contains "no general provision prohibiting a party from acting unilaterally upon its interpretation of the contract pending exhaustion of the grievance procedures," if indeed the dispute is a "minor" one involving disagreement on the interpretation of a collective bargaining agreement, as to which strike action interrupting commerce is precluded by the statutory scheme. *Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Company,* 447 F.2d 1127, 1132 (5th Cir.1971). *See also*

*Switchmen's Union of North America v. Central of Georgia Railway Company,* 341 F.2d 213, 216–17 (5th Cir.), *cert. denied,* 382 U.S. 841, 86 S.Ct. 41, 15 L.Ed.2d 82 (1965). For resolution of these minor disputes relating to the application or interpretation of an existing contract, the parties must resort to the mandatory and exclusive grievance procedures established by the Act. *Id.* Accordingly, a union may not sue for an injunction or damages concerning a "minor" dispute until after such dispute has been fully processed and disposed of in accordance with the grievance procedures established under the Act. *Andrews, supra,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95; *Switchmen's Union, supra,* 341 F.2d at 217.

█ Upon careful consideration of the issues raised, we conclude that the district court committed error in issuing injunctive relief to maintain the status quo in a "minor" dispute pending the resolution of the merits of this controversy before exhaustion of the arbitration procedures mandated by the Railway Labor Act and the collective bargaining agreement.

*Reversed and remanded for action consistent with this opinion.*