INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, Appellant,

v.

TRANS WORLD AIRLINES, INC., Appellee.

No. 80–2024.

United States Court of Appeals, Eighth Circuit.

Submitted May 21, 1981.

Decided Aug. 3, 1981.

Rehearing and Rehearing En Banc Denied Sept. 14, 1981.

Roger H. Schnapp, New York City, argued, for appellee.

William A. Jolley, Kansas City, Mo., Scott A. Raisher, Kansas City, Mo., argued, Steven A. Fehr, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for appellant.

Before GIBSON, Senior Circuit Judge, ARNOLD, Circuit Judge, and McMANUS,[*] District Judge.

ARNOLD, Circuit Judge.

The Independent Federation of Flight Attendants (IFFA), appeals from the denial by the District Court[1] of a preliminary injunction to prevent Trans World Airlines (TWA) from centralizing its crew scheduling operations. The union claimed that the unilateral decision by TWA to switch from individual-domicile scheduling planners to a computerized central operation constituted a substantial alteration of established working conditions of TWA flight attendants (FA's) and a violation of the collective bargaining agreement between the parties, in violation of the Railway Labor Act, 45 U.S.C. §§ 151 et seq.

We begin with a brief explanation of crew-scheduling operations. Under the airline's procedures, each FA is assigned to a specific domicile, or base station, located in the TWA flight-operations system. Domestic FA's are assigned to one of seven domestic domiciles, located in New York, Boston, Chicago, St. Louis, Kansas City, Los Angeles, and San Francisco. From these domiciles, or home bases, FA's are scheduled for duty, receive flight assignments, and are directly supervised. Prior to January 15, 1980, TWA maintained domestic scheduling offices at each of the seven domiciles. These offices were responsible for scheduling FA's who were not on a flight away from their domicile.

Each domicile scheduling office maintained certain written records which were called "master lists," "daily activity sheets," and "scheduling resumes." On the master lists was recorded relevant information concerning the working schedule of each FA assigned to that domicile. The daily activity sheets listed the number, departure, and domicile of FA's assigned to particular scheduled flights. On the scheduling resumes, the domestic scheduling office recorded all of the scheduling activities which occurred during each shift. FA's were encouraged to check the master schedules for any revisions in normal flight assignments. The master lists were especially useful in helping FA's trade flights with other FA's. All three of the documents were used by the union to ensure that TWA complied with the provisions of the collective-bargaining agreement.[2]

In January, 1980, TWA began instituting a computerized scheduling operation in Kansas City for the purpose of centralizing its crew scheduling. Over the next six months, the airline phased out the domestic scheduling offices in each of the seven domiciles except New York. The office in New York was to be phased out on October 1, 1980. The centralization of the scheduling operation resulted in the manually prepared masters' no longer being available at each domicile for inspection by the FA's and the union.

---

[*] The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

[1] The Honorable Russell G. Clark, Chief Judge, United States District Court for the Western District of Missouri.

[2] The union and TWA entered into a collective-bargaining agreement on October 11, 1978, which established the terms and conditions of employment for all TWA FA's. The scheduling of FA's for domestic and international flights is governed by Articles 18–A and 18–B, respectively, of the agreement.

These actions by TWA prompted the IFFA to file a complaint on August 6, 1980, in the District Court, charging TWA with violating various provisions of the Railway Labor Act. A motion for a preliminary injunction was filed on September 24, 1980, seeking to enjoin TWA from phasing out the New York domicile scheduling office, to direct TWA to reestablish scheduling offices in the other cities, and to direct TWA to provide the union with information that was previously available from the manually prepared master schedules. The District Court found that the changes being instituted by TWA were procedural only and did not affect "working conditions." The preliminary injunction was denied.

On appeal, the union argues that the District Court erred in concluding that TWA's actions in eliminating domicile crew scheduling and manually prepared master schedules did not constitute changes in the established working conditions of individual FA's or in the terms of the existing collective-bargaining agreement.

The IFFA relies on Section 2 Seventh of the Railway Labor Act, 45 U.S.C. § 152 Seventh, which states that "[n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." Section 6 of the Act, 45 U.S.C. § 156, sets forth the procedure for changing rates of pay, rules, and working conditions:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or *working conditions shall not be altered by the carrier until the controversy has been finally acted upon*, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

(Emphasis added). The union asserts that, under the facts of this case, Section 6 mandates that the status quo be maintained until such time as the procedure outlined therein is followed. This provision necessitates, the IFFA contends, the enjoining of TWA's actions in centralizing the airline's crew-scheduling operations. We cannot agree.

Section 6 of the Act applies only where there is an intended change "in agreements affecting ... working conditions" of the employees. The term "working conditions" is to be broadly interpreted. *United Transportation Union v. St. Paul Union Depot Co.*, 434 F.2d 220, 223 (8th Cir. 1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). It includes those actual, objective working conditions out of which the dispute arose and which may not necessarily be covered in an existing collective bargaining agreement. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). These conditions, however, must have achieved the level of established practices and customs. *United Transp. Union v. St. Paul Union Depot Co., supra*. We have held that "to establish a long-standing custom and practice, the conduct of the parties must encompass a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status." *General Committee of Adjustment v. Burlington Northern, Inc.*, 620 F.2d 161, 163 (8th Cir. 1980).

The District Court found that the availability of master crew schedules and "face to face" contact with crew schedulers

did not constitute "actual, objective working conditions." On the basis of the evidence, this finding is not clearly erroneous. The trial court permissibly found, at least for purposes of a motion for preliminary injunction, that personal (as opposed to telephone) contact with the schedulers and use of the master lists (as opposed to computer print-outs) were not practices which had been elevated to implied contractual status and therefore did not constitute "working conditions." The substantive rights and obligations of FA's remained unchanged. The changes affect primarily only the form in which information is made available. And TWA has undertaken to provide IFFA, on request, all information necessary to evaluate and respond to any specific problem, complaint, or grievance. See Brief for Appellee p. 7.

The union further argues that scheduling is one of the most, if not the single most, important aspect of a flight attendant's employment, and that the change to computer scheduling affects considerably the scheduling procedure and thereby alters the "working conditions" of the FA's. IFFA cites *United Transportation Union v. Penn Central Co.*, 443 F.2d 131 (6th Cir.), *cert. denied*, 404 U.S. 938, 92 S.Ct. 271, 30 L.Ed.2d 251 (1971), as support for its position. In that case the court held that the action of the railroad in substituting computer-prepared print-outs of employees' work schedules for mechanical "crew boards" constituted a unilateral change of working conditions. The court found that posting of the print-outs three times daily was not equivalent to maintaining a crew board as required by the collective-bargaining agreement.

Although *UTU v. Penn Central* is factually similar to the present case, it is distinguishable in that there the collective-bargaining agreement expressly required the maintaining of mechanical crew boards. See also *United Transportation Union v. Baker*, 499 F.2d 727 (7th Cir.), *cert. denied*, 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974), which involved a situation virtually identical to that in *UTU v. Penn Central*. The court in *Baker* questioned the decision in *Penn Central* and stated that the func-

tion of a District Court in this type of case is not to interpret the contract *de novo* but rather to determine whether the employer's contractual position is insubstantial. 499 F.2d at 731.

In addition, even if "working conditions" were involved here, it would still be necessary to consider whether this is a "major" or a "minor" dispute. The District Court found it unnecessary to address this issue after determining that TWA's change to centralized scheduling did not alter either the rules or the working conditions of the FA's.

 Where there is a "major" dispute, the settlement procedures of Section 6 must be followed. A "major" dispute is one arising out of the formation or change of a collective-bargaining agreement covering rates of pay, rules, or working conditions. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, supra*, 396 U.S. at 145 n.7, 90 S.Ct. at 296 n.7. A "minor" dispute, on the other hand, is one "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i); see *Elgin, J., & E. Ry. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Jurisdiction over a "minor" dispute lies exclusively with the National Railroad Adjustment Board, 45 U.S.C. § 153; see *Slocum v. Delaware L. & W. R. R.*, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950), and in such a case ."the court should exercise equitable discretion to give that agency first opportunity to pass on the issue." *Order of Railway Conductors v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946). If, however, the dispute is major, Section 6 expressly prohibits changes pending collective bargaining and thus authorizes injunctive relief to preserve the status quo. *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir. 1972).

 This Court has formulated a test to be applied in this situation: "[I]f the contract is reasonably susceptible to the inter-

pretations sought by both the carrier and union, the dispute is minor and within exclusive adjustment jurisdiction, . . . and the injunction can issue only upon an equitable showing of irreparable injury." *United Transportation Union v. Burlington Northern, supra,* 458 F.2d at 357. Here, the collective-bargaining agreement does not contain a specific provision requiring the use of manually prepared master schedules;[3] however, the agreement does provide that "[a]ll changes or amendments to the Domestic Scheduling Policy . . . shall be mutually agreed to . . . ." Art. 18–A(C)(1)(b). On the other hand, as the District Court found, TWA's actions appear to constitute merely technical changes in the *method* of scheduling and not changes in the Domestic Scheduling *Policy* itself. The airline's right to make these kinds of changes arguably is sanctioned by the agreement. Art. 6–A(K), at p. 32, refers to "the implementation of CAMS" as an event expected to take place. "CAMS" means Crew Administrative Management System, and one of IFFA's complaints is precisely that manually prepared masters have been replaced by CAMS-generated computer print-outs. And if TWA's actions can "arguably" be justified by the collective-bargaining agreement, or if the contention that the contract permits the disputed actions is not "obviously insubstantial," the controversy is a "minor" dispute. *United Transportation Union v. Baker,* 482 F.2d 228, 230 (6th Cir. 1973). The burden on the carrier to show such arguable justification is "relatively light." *Air Line Pilots Ass'n v. Northwest Airlines, Inc.,* 444 F.Supp. 838, 841 (D.Minn.1977), *aff'd per curiam,* 570 F.2d 257 (8th Cir. 1978).

We emphasize the procedural posture of this case—an appeal from a ruling on a motion for preliminary injunction. In this situation our reviewing function is circumscribed. We are bound by the District Court's findings of fact, unless they are clearly erroneous, which they are not. The District Court's findings, and our observations as to the governing law made in this opinion, are tentative and provisional, in the sense that different findings or conclusions might be warranted after a trial on the merits. But for the present, we are satisfied that there was no error in the Court below—especially as the preliminary equitable relief sought by IFFA would not merely have preserved the status quo, but would also have required TWA to undo much the greater part of its planned changes in scheduling procedures.

The judgment of the District Court is affirmed.

---

3. Letter of Agreement XIII, at pp. 267–68 of the collective-bargaining agreement, only briefly mentions master crew schedules. The agreement is to expire on July 31, 1981.