INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO (IAM), IAM District Lodge 143, Appellees,

v.

NORTHWEST AIRLINES, INC., Appellant.

No. 87–5235.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 2, 1987.

Decided April 5, 1988.

John J. Gallagher, Washington, D.C., for appellant.

Joseph Guerrieri, Jr., Washington, D.C., for appellees.

---

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Northwest Airlines (NWA) appeals from the grant of a permanent injunction by the district court requiring NWA to continue to abide by union security and dues check-off provisions in two collective bargaining agreements administered by the International Association of Machinists (IAM).[1] On appeal NWA contends that the district court did not have jurisdiction to issue the injunction. We disagree with the district court as to its analysis of the case, and we hold that the court was without jurisdiction under the Railway Labor Act (RLA), 45 U.S.C. §§ 151 *et seq.* (1982), to grant the injunction.

## I. BACKGROUND.

On August 12, 1986, NWA merged with Republic Air. Before the merger employees of both airlines had been represented separately by three unions: Brotherhood of Railway, Airline and Steamship Clerks (BRAC), Air Line Employees Association (ALEA), or IAM. IAM represented NWA employees in the mechanics-related craft or class under a collective bargaining agreement referred to as the Tan Book. That agreement is not at issue in this suit. BRAC represented NWA employees in the office, clerical, fleet and passenger service craft or class (clerical class), under another bargaining agreement (the Green Book). At Republic Air, both classes of employees were represented by ALEA under the Orange Book.

On the date of the merger, NWA notified BRAC, IAM, and ALEA that ALEA's certification was extinguished by the merger. NWA also informed the unions that the former Republic Air employees in the clerical class would now be represented by BRAC, and the former Republic Air mechanics-related workers would be represented by IAM. Thus, IAM continued to

---

1. A union security provision requires that an employee be a member in good standing of the union as a condition of continued employment. A dues check-off provision requires the carrier to deduct union dues from the paychecks of employees who expressly authorize such deductions, and remit the deductions to the union.

represent NWA workers under the Tan Book and IAM administered the Orange Book for former Republic Air workers. In anticipation of the merger, BRAC and NWA had worked out a Transition Agreement. Paragraph 13 of the Transition Agreement provided that the Agreement shall be binding on any successor labor organization. The Transition Agreement generally provided that the Green Book would be now applicable to those employees formerly in ALEA. Specifically, paragraph 8(b) of the Transition Agreement stated that Article 29 of the Green Book would govern the employees formerly represented by ALEA, as well as all BRAC-represented employees. Paragraph 8(a) specifically made any conflicting provisions of the Orange Book inoperative. No transition agreement was worked out with IAM concerning the former Republic Air mechanics-related employees, but it was undisputed that the Orange Book set forth the collective bargaining agreement applicable to those former ALEA employees represented by IAM.

Throughout this process, with specified exceptions not relevant here, NWA continued operating under the terms of the collective bargaining agreements negotiated with the predecessor unions. However, it refused to honor the dues check-off and union security provisions based on the Green Book and the Orange Book.[2] Article 29 of the Green Book is entitled "Union Security." Article 29H. contains the dues check-off provision. Article 29I. states: "This article shall be in force only so long as the Union continues as the recognized representative of the employees under this Agreement." Article 29 also defines the term Union "as used herein" to mean BRAC.

The Orange Book, which governed ALEA and Republic Air before the merger, was cast in different terms. There was no express provision in the sections on dues check-off and union security which would limit the effectiveness of those sections to only ALEA. However, NWA apparently interpreted section 24 of the Orange Book as an implied authorization for cessation of deduction of the union dues. Section 24 states that NWA is to deduct dues and remit them to the "Union." The "Union" in the Orange Book was originally defined in the preamble as the "Air Line Employees Association, International." NWA also relied on the authorization forms described in the Orange Book, which expressly assigned to ALEA the dues that were subject to checkoff.

On May 12, 1987, the National Mediation Board ordered a runoff election between BRAC, ALEA, and IAM to determine who would be the sole representative for all classes of employees. IAM was certified as the representative of the clerical class as a result of that election. Thus, IAM became the representative of both classes of workers and has administered all three collective bargaining agreements from that time on. It is undisputed that IAM and NWA are both bound by the existing agreements.

NWA refused to honor the dues check-off and security provisions of the Orange and Green Books, reasoning that they were not binding because BRAC and ALEA were replaced by a successor union. IAM brought suit against NWA, seeking an order requiring NWA to honor the dues check-off and union security provisions of the Orange and Green Books. The district court entered a permanent injunction which, in its judgment, preserved the status quo by requiring NWA to abide by the provisions. The injunction required NWA to deduct employees' union dues and remit them to IAM if an individual employee had authorized such action. The district court found the disagreement to be a major dispute and held that "it must be resolved according to the notice, negotiation, and mediation procedures outlined in the Railway Labor Act, 45 U.S.C. Sections 151 *et*

---

**2.** NWA did in fact deduct dues for BRAC-represented NWA employees in the clerical class up until the time that IAM was certified as the representative of that class. However, on August 12, 1986, NWA ceased dues check-off for the ALEA group when IAM assumed representation of them. IAM did not make a demand for union dues check-off until May 12, 1987, when it was elected and certified as the sole bargaining representative.

seq." Joint Appendix at 299. The district court then ordered that pending mediation, the security provisions and the contract obligations of NWA to check-off dues must continue as part of the status quo.

The district court characterized the determinative issue as whether the dispute was major or minor.[3] The court stated:

> The Court rejects and holds that there is not any reading of paragraph 13 which would render [Article 29] a nullity in the event of the selection of any other union than BRAC by the employees.

Joint Appendix at 294. The court then concluded:

> Paragraph 13 of the transition agreement served to modify the BRAC–Northwest agreement's prohibition, if any, there was on the application of the union's security and dues check-off provisions of that agreement to any labor organization other than BRAC. Paragraph 13 specifically contemplated that Article 29 as well as other provisions of the BRAC–Northwest agreement would be binding on a successor labor organization such as the IAM.

Joint Appendix at 297–98.

The district court also found the relevant provisions of the Orange Book did not even "purport on their face to limit [their] application." Joint Appendix at 298.

## II. ANALYSIS.

In our view, this case presents a clear example of a minor dispute, and thus the district court was not properly vested with jurisdiction.

A minor dispute is a disagreement over the interpretation and application of an existing collective bargaining agreement. The district court characterized the dispute in this case as major, based on its conclusion that the contract provisions at issue were susceptible to only one construction.

The court held that NWA's actions constituted a change in the collective bargaining agreement, mandating resolution under section 6 of the RLA. We disagree.

NWA submits that the proper construction of Article 29 of the Green Book, read in conjunction with the Transition Agreement, is that the dues check-off and security provisions ceased, or "dropped dead," when IAM succeeded BRAC in May of 1987.

NWA makes the following argument in support of its position: (1) by virtue of paragraph 13 of the Transition Agreement, IAM was bound by the Transition Agreement as the certified successor labor union; (2) by virtue of paragraph 8(b) of the Transition Agreement, Article 29 of the Green Book continued in full force and effect from the date of the merger, and its provisions could be triggered by the election of IAM as the successor labor union to BRAC; (3) by virtue of Article 29, section I of the Green Book, Article 29 ceased to be a part of the Green Book, or "dropped dead" when IAM replaced BRAC because BRAC was no longer the recognized representative of the NWA clerical workers.

■ It is not our function to interpret or construe the language of the contract. Rather, our function is to determine whether this case implicates a question of contract interpretation. We conclude that it does. The salient feature characterizing a section 3 minor dispute is that its resolution turns upon interpretation of the contract. *See supra* n. 3. Moreover, where the parties disagree over whether the dispute can be resolved by reference to an agreement, the dispute is minor unless the claims of contractual justification are "frivolous" or "obviously insubstantial." *Maine Central Railroad Co. v. United Transportation Union,* 787 F.2d 780, 783

---

**3.** A minor dispute is a disagreement over the interpretation and application of an existing agreement, and may be resolved by the National Railroad Adjustment Board pursuant to section 3 of the RLA, codified at 45 U.S.C. § 153. On the other hand, a major dispute is a disagreement over the formation of or a change in a collective bargaining agreement. Only if the

dispute is properly categorized as major does jurisdiction lie in the federal courts to preserve the status quo while the parties pursue mediation under section 6 of the RLA, codified at 45 U.S.C. § 156. *See Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945).

(1st Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Chicago and Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 278–79 (7th Cir.1981) (listing cases). This circuit has framed the test as follows:

> This Court has said that a dispute is minor if the agreement is "reasonably susceptible" of the interpretations sought by both the employer and the employees. Other courts have said that a dispute is minor if the employer's action can be arguably justified under the terms of the existing agreement, or that the dispute is minor unless the employer's argument that its actions are within the contract is "obviously insubstantial." These locutions are essentially the same in their result. They illustrate the relatively light burden which the [airline] must bear in showing that its actions are at most minor changes and thus within the status quo.

*Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.,* 802 F.2d 1016, 1022 (8th Cir.1986) (citations omitted); *see also United Transportation Union v. Burlington Northern, Inc.,* 458 F.2d 354, 357 (8th Cir.1972). This rule is a necessary adjunct of the need to protect the arbitrator's exclusive jurisdiction over minor disputes; this concern supports the additional corollary that "when in doubt, the courts construe disputes as minor." *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.,* 768 F.2d 914, 920 (7th Cir. 1985).

■ Because we believe that NWA's contract construction is plausible, and in any event not frivolous or obviously insub-

stantial, we conclude that the district court erroneously asserted jurisdiction over a minor dispute.[4]

The "drop dead" provision is nothing more than a durational clause similar to the one construed in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 809 F.2d 483 (8th Cir.1987), *aff'd per curiam by an equally divided court,* —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988). To hold that any durational clause embodied in a collective bargaining agreement is inoperable as a matter of law and the contract continues subject to procedures under section 6 of the RLA is an impermissible restriction on the parties' ability to contract. Although we agree that the collective bargaining agreement should be construed in a manner consistent with RLA policy, it does not follow that a court should disregard entirely the negotiated terms of the agreement.[5]

This court has noted that "a dues check-off provision is purely a creature of contract." *Trans World Airlines,* 809 F.2d at 491. The same is true of union security. Thus, we do not believe that it is proper for a federal court to disrupt the collective bargaining process by issuing a status quo injunction artificially extending a contractual right throughout the "almost interminable" process under section 6 of the RLA. In this context a status quo injunction would not be a neutral act. It would directly benefit the Union and could have the effect of extending the union security and dues check-off provisions far beyond the time contemplated by the parties.

One of the laudatory goals of the RLA is to promote good faith bargaining between

---

4. Similar considerations govern our analysis of the Orange Book and lead us to conclude that it is reasonably susceptible to more than one interpretation. We believe that Section 24, when read in conjunction with the preamble, could support NWA's interpretation that the agreement authorized the cessation of dues check-off when IAM succeeded ALEA in the administration of the Orange Book.

5. With respect to successor unions and their rights under collective bargaining agreements negotiated by a prior union, the National Mediation Board (NMB) has taken the position that "a change in representation does not alter or can-

cel any existing agreement made in behalf of the employees by their previous representatives." The First Annual Report of the NMB at 23–24 (1935) (II Joint Appendix at 312–13). We agree with this position, and we do not believe that giving effect to the "drop dead" clause violates the principles announced by the NMB. Giving effect to the "drop dead" clause will honor the CBA as negotiated by the prior representative with the clause left intact. For us to accept IAM's argument in support of excising the "drop dead" clause, however, would violate these principles announced by the NMB.

union and management, but giving the Union the leverage of a status quo injunction enforcing the dues check-off and union security provisions may in fact disrupt good faith bargaining.

We think that the First Circuit stated it best in *International Association of Machinists and Aerospace Workers v. Eastern Airlines, Inc.*, 826 F.2d 1141 (1st Cir. 1987), when it stated that:

> The granting of the preliminary injunction in this case [will give] the IAM an advantage that neither the law, the collective bargaining agreement, nor labor relations practice contemplates. * * * If [IAM loses its union security and dues check-off rights], the answer to this problem is not through judicial intervention in the reformation of a collective bargaining agreement, but rather through the renegotiation of these provisions when the appropriate time arises. This is a private matter between the negotiating parties in which the courts have no business intervening.

*Id.* at 1148 (citations omitted).

Further, to the extent that the district court relied on *Manning v. American Airlines, Inc.*, 329 F.2d 32 (2d Cir.), *cert. denied*, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964), we disagree. The *Manning* court construed the durational language governing dues check-off found in an agreement that was separate from the main collective bargaining agreement. The language provided that the check-off agreement "shall be subject to renewal thereafter only by mutual agreement of the parties hereto." *Manning*, 329 F.2d at 34. The court stated that "[i]n our view the * * * language meant only that automatic renewal of the basic agreement would not carry the check-off agreement along with it." *Id.* We disagree with the *Manning* decision for two reasons. First, we disagree with the court's interpretation of the check-off agreement's durational clause. We think it is clear that the language in the check-off agreement was intended to prevent its automatic renewal. Second, to the extent that the *Manning* court attempted to interpret the check-off agreement language, the court exceeded its role. The court should only have looked at the language of the agreement to determine if management had met its "relatively light" burden of showing that its action was based on its interpretation of the agreement. That is the role that we exercise in this case. We believe that NWA's actions were based on a plausible reading of the relevant agreements.

Finally, we note in passing that there is a strong public policy against judicial involvement in labor disputes by way of injunctive relief. *See IAM v. Eastern Air Lines*, 826 F.2d 1141, 1145 (1st Cir.1987).

Based on the foregoing, we conclude that the district court lacked jurisdiction to issue an injunction in this case. Accordingly, the order of the district court is reversed, and the injunction is dissolved.

LAY, Chief Judge, dissenting.

I respectfully dissent. I cannot join the majority opinion for several reasons:

(1) Its analysis is without any support in law or fact.

(2) It ignores without discussion the law governing successor representation under the RLA.

(3) It wrongly concludes that IAM is bound by the Transition Agreement between BRAC and NWA to which IAM was not a signatory party; such a conclusion violates basic principles of law.

(4) It creates a false issue of contract interpretation where none exists.

(5) It legally treats without analysis the ALEA contract to be the same as the BRAC contract when the two contain provisions which are completely different.

(6) It totally miscomprehends the procedural mechanism relating to unilateral changes of working conditions under the RLA.

On May 12, 1987, after the Republic–Northwest merger, IAM won a run-off election and, as a result, was certified as the sole representative for the classes of employees represented in this suit. It is undisputed that IAM and NWA have never entered into any kind of transition agree-

ment. However, both parties agree that IAM is bound by and does continue to administer the old BRAC (Green Book) and ALEA (Orange Book) collective bargaining agreements. IAM and NWA are bound by these agreements not by reason of any pre-existing transition agreement but by operation of law.[1]

By reason of the election and certification there is no question that IAM succeeds and becomes the representative union administering the old collective bargaining agreements. The Orange Book speaks of ALEA as the union and the Green Book denotes BRAC as the representative union. Upon election and certification IAM was simply substituted as the sole representative under those agreements in place of both ALEA and BRAC. This substitution is not operative because of the agreements; succession as bargaining representative is made expressly mandatory by reason of IAM's election and certification. IAM succeeds ALEA and BRAC *by operation of law* and no terms or obligations under the contracts are changed.

The National Mediation Board has recognized this proposition in these terms:

> When there is an agreement in effect between a carrier and its employees signed by one set of representatives and the employees choose new representatives who are certified by the Board, the Board has taken the position that a change in representation does not alter or cancel *any* existing agreement made in behalf of the employees by their previous representatives.

The First Annual Report of the National Mediation Board at 23–24 (1935) (II Joint Appendix at 312–13) (emphasis added). The Board later expanded upon that statement:

> The only effect of a certification by the Board is that the employees have chosen other agents to represent them in dealing with the management under the existing agreement. * * * Conferences must then be held to agree on [any desired] changes exactly as if the original representatives had been continued. The purpose of such a policy is to emphasize a principle of the Railway Labor Act that agreements are between the employees and the carrier, and that the change of an employee representative does not automatically change the contents of an agreement. *The procedures of section 6 of the Railway Labor Act are to be followed if any changes in agreements are desired.*

Forty–Second Annual Report of the National Mediation Board at 39 (1976) (II Joint Appendix at 315) (emphasis added).

As stated by the Fifth Circuit Court of Appeals: "If the employees designate a new collective bargaining representative, it succeeds to the status of the former representative without alteration in the contract terms." *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (Airline Division) v. Texas Int'l Airlines, Inc.,* 717 F.2d 157, 163 (5th Cir.1983). NWA asserts, however, that the Green Book expressly limits dues check-off to the period when BRAC represented the employees. IAM urges in part that section 13 of the Transition Agreement must be read as substituting IAM for BRAC throughout the Green Book and therefore the carrier's obligations do not cease. The district court in part adopted this analysis, stating that there is no susceptible reading of the two agreements that allows NWA to cease the dues check-off. NWA responds that if the contract is reasonably susceptible to two interpretations, then the dispute becomes a minor one and must go to arbi-

---

**1.** The Transition Agreement entered into between BRAC and NWA on July 13, 1986, provides that it would be binding on any successor labor union. Judge Magill finds a need to interpret this Transition Agreement along with the Green Book in order to support his "minor dispute" premise. This is an irrational straw man. The old BRAC–NWA Transition Agreement is totally immaterial and irrelevant to this case. To suggest otherwise violates basic contract principles. IAM was not a party to that agreement and BRAC and NWA could not bind IAM to any terms without IAM's consent. NWA tried to obtain a separate transition agreement with IAM but it *did not succeed.* Thus, the majority's basic assumption of contract interpretation is fallacious.

tration. If NWA is correct in urging that resolution of the dispute depends upon the interpretation of the agreements then clearly the dispute is a minor one. *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). However, in this approach, NWA creates a misleading issue. The necessity to read the contracts is not equivalent to interpreting them, and does not in itself transform a major dispute into a minor one.

The Orange Book does not contain a clause limiting dues check-off only for ALEA. There is no limitation in the Orange Book as contained in the Green Book. The majority in footnote 4, although admitting the Green Book's "drop dead" clause is not contained in the Orange Book (the old ALEA contract), nonetheless finds that "similar considerations" govern the analysis of both agreements. This is absurd. There exists no cessation clause in the Orange Book. IAM simply succeeds to the representative state of ALEA and is substituted for ALEA throughout that agreement. The majority's reasoning would allow NWA to void the entire agreement or whatever part it chooses because IAM is not the union originally designated or defined in the preamble of the Orange Book. This clearly is not the law and such analysis ignores the entire purpose and spirit of the RLA.[2] IAM was not even a party to the Transition Agreement between BRAC and NWA. Nonetheless, as previously stated, NWA and IAM are obligated to continue the terms of the Green and Orange Books, not by agreement but by operation of law. Under such circumstances no cessation of the existing terms of the

agreements affecting working conditions may be unilaterally implemented by either party until the mediation procedures under section 6 of the RLA have been exhausted.

In this regard *Manning v. American Airlines, Inc.*, 329 F.2d 32 (2d Cir.), *cert. denied,* 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed. 2d 29 (1964) succinctly states another controlling principle. *Manning* involved a dues check-off clause that by its terms expired on April 30, 1963, unless renewed by mutual agreement between the union and the carrier. The rest of the collective bargaining agreement renewed automatically unless written notice was given as provided under section 6 of the RLA. On May 1, 1963, the carrier discontinued dues check-off. The Second Circuit held that if the carrier were permitted to discontinue dues check-off *under the terms of the contract,* then the parties to a collective bargaining agreement could completely avoid the effects of section 6 of the RLA. That court had no difficulty in concluding that dues check-off constituted a working condition within section 6. Judge Friendly reasoned: "The purpose of § 6 was to prevent rocking of the boat by either side until the procedures of the Railway Labor Act were exhausted; interpreting 'working conditions' to include an agreed check-off accomplishes that purpose better than a narrower construction." *Id.* at 35. Judge Friendly also stated that when working conditions are involved, "[t]he effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination." *Id.* at 34.

---

**2.** As Judge Bright succinctly stated recently in *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants,* 809 F.2d 483 (8th Cir.1987) *aff'd per curiam by an equally divided court,* —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988):

Congress, in enacting these detailed procedures, sought "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & Toledo Shore Line R.R.,* 396 U.S. [142] at 148, 90 S.Ct. [294] at 298 [24 L.Ed.2d 325 (1969) ] (footnote omitted). This detailed statutory scheme has bargaining as its major thrust. At the same time, it seeks to avoid any interruption in commerce. *Brotherhood*

*of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 32 L.Ed.2d 344 (1969). The Act attempts to provide the parties with every opportunity to resolve their labor disputes through bargaining and negotiation.

*Id.* at 486.

The majority's analysis in this case would, if adopted, radically defeat the purpose of the mechanisms under the RLA and cause self-help and disastrous interruptions of commerce whenever there was a change of the certified representative following a merger of two carriers. Surely Congress did not intend such a result.

Thus, I must conclude that continuation of working conditions (union dues check-off and union security provisions) during the notice and mediation provisions of the RLA is *not* governed by the purported limitation of dues check-off and union security to the predecessor union by contract interpretation, but by reason of the RLA itself.

Section 6 of the Railway Labor Act, 45 U.S.C. § 156, sets forth the procedures to be followed to effect a change of rates of pay, rules, or working conditions. "The objective of the Railway Labor Act is continuance of the status quo until the statutory procedures of the Act have been exhausted." *United Indus. Workers of the Seafarers Int'l Union of N. Am. v. Board of Trustees of Galveston Wharves*, 400 F.2d 320, 329 (5th Cir.1968) (footnote omitted), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). "The term 'working conditions' is to be broadly interpreted." *Independent Fed'n of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155, 157 (8th Cir.1981). This court, as well as the courts of other circuits, has found that working conditions include both union security and dues check-off provisions. *See, e.g., Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants*, 809 F.2d 483 (8th Cir.1987) (union security and dues check-off) *aff'd per curiam by an equally divided court*, — U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988); *Manning v. American Airlines, Inc.*, 329 F.2d 32 (2d Cir.) (dues check-off), *cert. denied*, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964).

Judge Magill ignores this entire body of law. The rule in all of these cases comports with the universal principle that federal district courts may issue injunctions to preserve the status quo of working conditions even though the agreements have expired by their own terms. *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164, 168 (2d Cir.), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); *United Indus. Workers of the Seafarers Int'l Union of N. Am. v. Board of Trustees of Galveston Wharves*, 351 F.2d 183, 190 n. 26 (5th Cir.1965).

In *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) the Supreme Court defined the status quo provisions of the RLA that govern here. The Court said:

There are three status quo provisions in the Act, each covering a different stage of the major dispute settlement procedures. Section 6, the section of immediate concern in this case, provides that "rates of pay, rules, or working conditions shall not be altered" during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5 First provides that for 30 days following the closing of Mediation Board proceedings "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose," unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, "to exert every reasonable effort" to settle disputes without interruption to interstate commerce.[3]

---

3. As stated in the RLA:

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First (quoted in *Shore Line,* 396 U.S. at 151 n. 18, 90 S.Ct. at 300 n. 18).

*Id.* at 150–51, 90 S.Ct. at 299–300 (some footnotes omitted).

Because the dues check-off and union security provisions are working conditions, they must be maintained pending completion of the procedures contemplated in section 6 of the RLA. Issuance by the district court of an injunction is proper to maintain the working conditions. I conclude NWA's unilateral attempt to change those conditions under the contracts is impermissible without compliance with section 6 of the RLA.[4]

4. IAM asserts that this case is moot, because the district court stated that the injunction was to cease on August 5, 1987, as to all employees who did not complete a new authorization card for dues check-off. I disagree. At oral argument it was conceded that over eighty percent of the relevant employees had in fact filled out the cards. Thus, at least as to them, the district court's injunction still exists.